# In the United States Court of Federal Claims

No. 11-298 C
(Filed under Seal:  August 26, 2011)
(Reissued for Publication:  September 16, 2011)[*]
BID PROTEST
TO BE PUBLISHED

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC. d/b/a CWTSATOTRAVEL, | Pre-Award Protest; Standing; Ambiguous Solicitation Terms; Changes Clause, Commercial Items, FAR 52.212-4(c); |
| Plaintiff, | Customary Commercial Practice, FAR 12.301(a)(2); Market Research; Waiver of |
| v. | Five-Year Limit, FAR 17.204(e); Waiver of Customary Commercial Practice, FAR |
| THE UNITED STATES, | 12.302(c); Excusable Delays, FAR 52.212-4(f); Contract Disputes Act, 41 |
| Defendant, | U.S.C. § 605 (re-codified as § 7103); FAR Part 33; Competition in Contracting Act, |
| and | 41 U.S.C. § 253a (re-codified as § 3306); Declaratory Relief |
| CONCUR TECHNOLOGIES, INC., | |
| Defendant-Intervenor. | |

Lars E. Anderson, VENABLE LLP, Vienna, VA, for plaintiff.

Gregg Paris Yates, Trial Attorney, Alan J. Lo Re, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Virginia Grebasch, Staff Counsel, Office of the General Counsel, U.S. General Services Administration, of counsel.

Michael D. McGill, Hogan Lovells U.S. LLP, Washington, D.C., for defendant-intervenor.

---

[*] This Opinion and Order was originally filed under seal on August 26, 2011, pursuant to the protective order entered in this action on May 19, 2011 (docket entry 13).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a Joint Report (docket entry 49) on September 15, 2011, proposing certain redactions, which the Court has adopted.  Accordingly, the Court is reissuing its Opinion and Order dated August 26, 2011, with the agreed redactions indicated by three consecutive asterisks within brackets ([***]).

## OPINION AND ORDER

GEORGE W. MILLER, Judge

CW Government Travel, Inc., doing business as CWTSATOTravel ("CWT"), filed this bid protest challenging General Service Administration ("GSA") Solicitation No. QMAD-JM-100001-N ("Solicitation"), which seeks offers to provide various federal agencies with web-based travel management services.  CWT requests declaratory and injunctive relief against GSA's inclusion of certain provisions in the Solicitation.  For the reasons set forth below, the Court **GRANTS IN PART** CWT's motion for judgment on the administrative record and holds that GSA's use of the 15-year fixed pricing schedule violates customary commercial practice and is, in the absence of a valid waiver, arbitrary, capricious, and contrary to law.  The Court **DENIES** CWT's motion with respect to its remaining claims.  The Court **GRANTS IN PART** the Government and defendant-intervenor's cross-motions for judgment on the administrative record with respect to all claims other than the 15-year fixed pricing schedule, and the Court **DENIES** the Government and defendant-intervenor's cross-motions with respect to the 15-year fixed pricing schedule.

## I.    Background

### A.    E-Gov Travel Service 1

CWT is a private travel services corporation with its principal place of business in Arlington, Virginia.  Compl. ¶ 5.  GSA manages travel policy for federal government agencies and has procurement authority for travel programs throughout the federal government.  Def.'s Mot. at 3.

In 2003, GSA implemented the E-Gov Travel Service, a system by which federal civilian agency employees procure official travel and accommodations.  AR 4670.  In November 2003, GSA awarded ten-year contracts for the first generation E-Gov Travel Service contractor program ("ETS1") to provide federal agencies with commercial web-based travel management services to three contractors:  CWT, Hewlett Packard, and Northrop Grumman.  AR 4670-71.  The contracts were each performance-based, indefinite delivery/indefinite quantity ("ID/IQ") contracts to procure travel management services as commercial items pursuant to Federal Acquisition Regulation ("FAR") Part 12.  AR 4670-71.  The three ETS1 contracts are set to expire on November 11, 2013, and, as a result, GSA is implementing a follow-on procurement for the next generation of automated travel management contracts, currently referred to as E-Gov Travel Service 2 ("ETS2").   AR 4671.

### B.    ETS2 Solicitation

In preparation for the ETS2 acquisition, GSA conducted various forms of market research, which included participating in industry events focusing on business and corporate travel management, reviewing trade association publications, participating in exchanges with industry representatives, reviewing industry publications, and working with GSA employees with commercial travel industry backgrounds.  AR 4671.  In addition, GSA surveyed government agencies and firms to determine their ability to configure solutions for customer

needs.  AR 4284-89.  Based on that research and its experience with ETS1, GSA decided to again contract with private third-parties for its travel services.  AR 4677.

On August 23, 2010, GSA issued the Solicitation at issue in this case for the provision of travel management services through the ETS2 program as a commercial item.  AR 766.  The Solicitation contemplates the award of a firm, fixed-price, ID/IQ contract to one or more contractors.  AR 36.  The performance period is fifteen years, with a base period of three years and three four-year option periods.  AR 4.  GSA anticipates that ETS2 will provide significant aspects of federal business travel, including travel planning, authorization, reservations, ticketing, fulfillment, expense reimbursement, and travel management reporting.  AR 33.

The Solicitation Statement of Work includes numerous tasks, which are categorized as either "mandatory" or as "objectives."  CWT raises several challenges against the following nine categories of provisions contained in the Solicitation:

*Federal Travel Policy Compliance.*  The Solicitation requires that the contractor provide a "Policy Reinforcement Feature" that authorizes the Government or the contractor to update the ETS2 system to reflect changes in federal travel policies and regulations on the effective dates of the changes without the need for reprogramming.  AR 44.

*Travel Management Centers.*  Travel management centers provide traditional travel services and are staffed with travel agents.  Pl.'s Mot. at 14.  An accommodated travel management center "is a third-party contractor selected by one of the 70 potential customer Federal agencies to serve as the provider of that agency's travel management center services."  Pl.'s Mot. at 14.  The Solicitation requires that the contractor accommodate any change in an agency's travel management center, AR 67, and GSA has estimated the cost to the contractor of accommodating such changes to be between $5000 and $50,000.  Pl.'s Reply at 15-16 (citing AR 4290).

*Federal Enterprise Architecture.*  Federal Enterprise Architecture ("FEA") refers to the Government's best practices for information systems, and is designed to facilitate the sharing of information and resources among federal agencies.  AR 4685-86 (Contracting Officer ("CO") Statement of Facts).  The terms of the Solicitation require that the contractor comply with and incorporate changes in the FEA over the life of the contract.  AR 97.

*Security Capabilities and Characteristics.*  The Solicitation requires that the contractor meet or exceed security standards set by GSA, the National Institute of Standards and Technology, the Office of Management and Budget, and "other Federal laws and mandates within the accreditation boundary."  AR 103.

*Mobile Devices.*  The Solicitation contemplates that the contractor will seek to provide a full range of ETS2 services on mobile devices, AR 37, incorporate software capabilities to utilize the ETS2 system on mobile platforms, AR 40, 43, provide travel itinerary on mobile platforms, AR 52, and support the capability for travelers to submit electronic images of expense receipts through mobile devices, AR 80.

*Reports.*  The Solicitation requires that the contractor provide standard reports regarding information about the status of travel documents and operational information concerning travel plans whenever such reports are deemed necessary by the Program Management Office.  AR 135.

*Agency Business Systems.*  The Solicitation requires that the contractor "integrate with . . . agency business systems bi-directionally, such as financial, human resources, [and] charge card vendors. . . . The Contractor shall include all costs associated with establishing standard integration configuration . . . in its voucher fee pricing."  AR 127.

*Government Credit Card Vendors.*  Section C.4.2.26.1 requires that a contractor support an agency's credit card account transition "either because of the end of the SmartPay 2 contract or [because] an agency changes their SmartPay 2 vendor."  AR 96 (capitalization altered).  Such a transition requires the contractor "to develop and deliver a comprehensive, agency-specific Transition Plan that ensures no disruption of service during normal business hours" and to provide resources such as hardware, software, and personnel to achieve a transition without disruption of service.  AR 96.

*Data Security.*  The Solicitation requires that the contractor deliver at no additional cost to either a third-party vendor or to GSA all data that are generated by and stored in ETS2.  AR 133.

C.      *CWT's GAO Protest*

        1.      CWT's First GAO Protest

On November 10, 2010, CWT filed a pre-award bid protest at the Government Accountability Office ("GAO") challenging the Solicitation on four general grounds:  (1) the Solicitation's pricing structure unreasonably and unfairly exposed offerors to excessive risk of performing unlimited additional work at no additional cost to GSA and without adequate information; (2) GSA improperly utilized the FAR provisions regulating the acquisition of commercial items; (3) some of the Solicitation's requirements unduly restricted competition; and (4) some provisions were ambiguous and failed to provide offerors with sufficient information to prepare their proposals intelligently or to compete on an equal basis.  *CWTSatoTravel*, B-404479.2, 2011 WL 1553553, at *2 (Comp. Gen. Apr. 22, 2011).

In response to CWT's initial GAO protest, GSA issued Amendment 0009, which added the following so-called Market Adjustment Clause to the Solicitation:

        The Government recognizes the potential impact of unforeseeable major changes
        in market conditions.  For those cases where such changes do occur, the
        contracting officer will review requests to make adjustments, subject to the
        Government's examination of industry-wide market conditions and documents
        requested by the contracting officer to support the reasonableness of the price
        adjustment.  If adjustments are accepted, the contract will be modified
        accordingly.  The determination of whether or not extra-ordinary circumstances

exist rests with the contracting officer. The determination of an appropriate mechanism of adjustment will be subject to negotiations.

AR 1875 (D.41).  On December 3, 2010, GSA sent a brief letter to GAO stating that "GSA will take corrective action in this matter" and requesting that GAO dismiss CWT's protest.  Compl. ¶ 22.  GSA stated that "it had made one substantial amendment since this protest was filed," and that it "intends to make at least one more, addressing issues raised in the protest."  Compl. ¶ 22.  GAO dismissed the protest based on GSA's promise to further amend the Solicitation.  *CWTSatoTravel*, 2011 WL 1553553, at *2.

> 2.    CWT's Second GAO Protest

On January 12, 2011, CWT filed another bid protest with GAO, reasserting its allegations about the terms of the Solicitation.  AR 4537-39.  In that protest, CWT raised four challenges similar to those CWT now raises in this action:  (1) whether the agency properly complied with FAR policies and procedures governing the acquisition of commercial items, AR 4543-70; (2) whether the Solicitation improperly exposed the ETS2 contractor to excessive risk by requiring that an offeror's fixed fee include various updates to the ETS2 system over the contract's term of up to 15 years, AR 4570-74; (3) whether the Solicitation provisions requiring updates to the ETS2 system over the term of the contract were unduly restrictive of competition, AR 4574-76; and (4) whether a number of Solicitation provisions were overly broad and ambiguous, AR 4576-93.

On April 22, 2011, GAO issued a decision rejecting the first three grounds in their entirety but sustaining CWT's protest as it related to the ambiguity of certain Solicitation provisions with respect to whether they were "mandatory requirements" or merely "objectives." *CWTSatoTravel*, 2011 WL 1553553, at *11.  As a result, GAO recommended that GSA amend the Solicitation to clarify those provisions.  *CWTSatoTravel*, 2011 WL 1553553, at *11.

In response, GSA issued Amendment 0013 on June 3, 2011, AR 4847-49, which clarified that "mandatory requirements" are "essential functionalities, capabilities, and characteristics that must be provided to ensure regulatory and contract compliance."  AR 38 (C.3.1.1).  The optional "objectives," on the other hand, include "functionalities, capabilities, and characteristics" that "contribute significantly to the overall quality of ETS2" and "contribute to the eventual achievement of all Federal Government ETS2 goals."  AR 38 (C.3.1.2).

> D.    *This Action*

On May 13, 2011, CWT filed this action (docket entry 1) alleging that:  (1) the pricing provisions are ambiguous; (2) the nine challenged provisions permit GSA to order unilateral, uncompensated changes in violation of the changes clause in FAR 52.212-4(c); (3) the nine challenged provisions are not consistent with customary commercial practice in violation of FAR 12.301(a)(2), and the same is true of both the standards for determining whether a transaction is agent-assisted and for the 15-year fixed pricing schedule; (4) the Market Adjustment Clause is ambiguous and unlawful; and (5) the Solicitation unduly restricts competition in violation of the Competition in Contracting Act, 41 U.S.C. § 253a.

Concur Technologies, Inc. ("Concur") submitted a proposal for the ETS2 contract on November 15, 2010, and Concur moved to intervene in this action on May 16, 2011 (docket entry 9). The Court granted Concur's motion on May 26, 2011 (docket entry 17).

The Government filed the administrative record on May 23, 2011 (docket entry 16). CWT moved for judgment on the administrative record and requested declaratory and injunctive relief (docket entry 21, June 7, 2011). Both the Government (docket entry 23) and Concur (docket entry 22) filed cross-motions for judgment on the administrative record on June 22, 2011. On July 6, 2011, CWT, in conjunction with Northrop Grumman, submitted a proposal in response to the Solicitation. Aug. 11, 2011 Hr'g at 11:33. On August 11, 2011, the Court heard oral argument on the parties' motions.

## II.    CWT Alleges a Non-Trivial Competitive Injury and Thus Has Standing to Pursue This Pre-Award Challenge to the Solicitation.

At the outset, Concur argues that CWT lacks standing to bring this suit, which, if true, would require the Court to dismiss the action for lack of jurisdiction.[1] *See* Int.'s Mot. at 13; *cf. Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) (holding that a plaintiff's lack of standing "precludes a ruling on the merits"). In bid protest cases, a plaintiff seeking to establish standing must demonstrate that it is an "interested party." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). A plaintiff is an interested party if it "'(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Id.* (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). CWT is an actual bidder and therefore satisfies the first prong.

To establish the second prong, *i.e.*, possessing a "direct economic interest," a plaintiff must demonstrate "prejudice," which in pre-award protests, means a "non-trivial competitive injury which can be redressed by judicial relief." *Id.* at 1361. Concur argues that the provisions that CWT challenges affect all would-be contractors equally, so even if the Solicitation violates the FAR or other law, the challenged provisions impose no competitive disadvantage on CWT. Int.'s Mot. at 13.

During oral argument, counsel for CWT stated that "the terms of the Solicitation prevented CWT . . . from submitting a proposal."[2] Aug. 11, 2011 Hr'g at 9:34. CWT further explained that due to CWT's status as one of just three incumbent contractors, "[CWT] would

---

[1] In its decision, GAO determined that CWT lacked standing to challenge whether GSA had improperly used commercial item procedures and policies, noting that CWT had failed to show how the terms "prejudice[d] the firm's competitive position." *CWTSatoTravel*, 2011 WL 1553553, at *9.

[2] As stated above, CWT did ultimately submit a proposal (jointly with Northrop Grumman) on July 6, 2011. Aug. 11, 2011 Hr'g at 11:33. Counsel for CWT stated that the proposal was a qualified one, submitted only to preserve the firm's ability to secure an award under more favorable terms, and that CWT will likely withdraw its proposal if its protest before this Court fails. *Id.* at 11:33.

normally have . . . an advantage" in securing an award, but the allegedly unlawful terms "neutralize[]" that advantage.  *Id.* at 9:43 (citing *Weeks Marine*, 575 F.3d 1352).  Thus, CWT alleges that the challenged terms negate the advantage that stems from CWT's experience with and investment in ETS1.

CWT's allegations distinguish its status from that of the protestor in *ICP Northwest, LLC v. United States*, 98 Fed. Cl. 29 (2011).  In that case, the protestor did not allege that the solicitation terms prevented it from submitting a bid or even from securing an award; indeed, it appeared likely that the protestor *would* receive an award under the solicitation.  *Id.* at 37. Rather, the protestor relied on its assertion that under the solicitation, other firms that received awards would shirk their contractual responsibilities and that those firms' resulting "lowball" bids would lower the competitive bidding price generally.  *Id.* at 36.  The Court was not persuaded, concluding that—to the extent the protestor's theory was even plausible—the protestor ultimately "would not be injured, but rather *benefitted* by such behavior."  *Id.*

In contrast, CWT adequately explains, at this early stage, how the terms in question would cause CWT non-trivial competitive injury.  CWT argues that the terms in question affect it in ways that do not affect other bidders, and that, as a result, CWT is effectively "deprived of the opportunity to compete," *Google v. United States*, 95 Fed. Cl. 661, 674 (2011).  Neither the Government nor Concur effectively rebut CWT's argument.  The Court therefore concludes that CWT has demonstrated the requisite competitive injury, and, as a result, has established its standing to bring this action.

## III.    Motions for Judgment on the Administrative Record

### A.      *Standard of Review*

Pursuant to 28 U.S.C. § 1491(b)(1), the Court reviews agency actions in bid protest cases to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (internal quotation marks omitted); *see also* 28 U.S.C. § 1491(b)(4) (incorporating standards of review from the Administrative Procedure Act, 5 U.S.C. § 706).  To show that an error occurred, the protestor must establish by a preponderance of the evidence that the Government's actions either lacked a reasonable basis or violated applicable statutes or regulations.  *Banknote Corp.*, 365 F.3d at 1351.  Protestors invoking the claim that agency action is contrary to law must show a "clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)).

In reviewing cross-motions for judgment on the administrative record, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006).  In a manner "akin to an expedited trial on the paper record," the Court will make findings of fact where necessary.  *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (internal quotation marks omitted).

>       B.      *The Pricing Breakdown Structure Is Not Ambiguous Because It Is Not Open to*
>               *More Than One Reasonable Interpretation.*

CWT argues that the Solicitation language describing how the agency will utilize bidders' pricing assumptions is inconsistent with the CO's statements before GAO, thus rendering the Solicitation ambiguous in this respect.[3]  Pl.'s Mot. at 32-35.

The Solicitation includes the following language:

> The price proposals shall be based on the estimated quantities in Section B, but please note, these are estimates only and no guarantee of actual volumes to be realized under any resultant contract. . . .

> [Price proposals shall contain p]ricing assumptions used by Offeror to include limits or other parameters around meeting the Government's requirements.  [Price proposals] should include all assumptions associated with meeting technical refresh requirements, changes in report development (e.g., Section C.9.1 #10), policy updates, and security changes (e.g., Section C.6.1.1).  For example, if the CLIN pricing assumes XX number of programming hours or XX number of policy or security changes over a defined period to accomplish major and minor releases, these assumptions should be identified so that they may be evaluated in accordance with Section F.  Pricing assumptions, however, must not include changes necessary to address software or service defects . . . .

AR 695 (E.6.3.5).  CWT argues that this language, which allows offerors to identify the assumptions they made in pricing their proposal, does not explicitly state that "offerors can establish parameters or limitations on the additional work they are required to perform if awarded" a contract.  Pl.'s Mot. at 32.  Rather, CWT argues, the language suggests only that GSA will use the pricing assumptions to evaluate an offeror's understanding of the work to be done.  *Id.* at 33.

The Court interprets the Solicitation differently than does CWT.  The Solicitation language relating to the effect of pricing assumptions adequately advises offerors that they can, by making their pricing assumptions explicit, establish limitations on the work they can be required to perform.  As the CO stated during CWT's GAO protest, the agency "expect[s] offerors to define what pricing assumptions and parameters they believe are necessary to accomplish the work," AR 4679, and "[n]othing prohibits any offeror from identifying parameters around its offered pricing (e.g., XX number of changes per year or XX number of programming hours over the life of the contract) or using a number of standard commercial

---

[3] As stated above, in this case, GAO sustained CWT's challenge based on certain other ambiguous Solicitation terms and recommended that GSA clarify those ambiguities, *CWTSatoTravel*, 2011 WL 1553553, at *11, which it did.  In so doing, GAO cited other GAO decisions that had taken similar action.  *Id.* (citing, *e.g.*, *Airtrak Travel et al.*, B-292101 *et al.*, 2003 WL 21499653, at *14 (Comp. Gen. June 30, 2003).

pricing practices and strategies such as offering annual price escalations or price escalations to be effective during optional periods of performance." AR 4680.

For a solicitation term to be ambiguous, it must be open to more than one reasonable interpretation. *Grumman Data Sys. Corp. v. United States*, 88 F.3d 990, 997 (Fed. Cir. 1996). CWT fails to offer an interpretation that accounts for all the terms in the Solicitation's pricing provisions. Specifically, Section 2 of the pricing instructions states that a price proposal "shall contain . . . [p]ricing assumptions used by [the] offeror to include *limits . . . around meeting the Government's requirements*." AR 695 (E.6.3.5) (emphasis added). CWT contends that such pricing limits are to be used to evaluate the offeror's understanding of the work, but CWT fails to explain what "limits . . . around meeting the Government's requirements" could mean under its proposed interpretation.

The Solicitation could be more explicit in stating that the contractor will only be required to perform the Solicitation's mandatory requirements to the extent of its proposed pricing assumptions. However, the Court will not find a provision of a solicitation ambiguous just because it could have been more clearly drafted. *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). It is outside the Court's bid protest authority to invalidate a solicitation term simply because the Court might have drafted the language differently or used a different approach. *See id.* (holding that where the court "finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." (internal quotation marks omitted)).

CWT has not shown that the provisions relating to the effect of pricing assumptions are open to more than one reasonable interpretation, and those provisions are not so unclear or otherwise unreasonable as to justify judicial intervention in this pre-award context to require GSA to redraft the provisions dealing with the effect of the offeror's pricing assumptions.[4]

    C.    *The Nine Provisions of the Solicitation That CWT Challenges Do Not Violate the Changes Clause at FAR 52.212-4(c) Because They Do Not Authorize GSA to Make Unilateral, Uncompensated Changes.*

CWT contends that the nine challenged provisions permit GSA to require unilateral, uncompensated changes in violation of FAR 52.212-4(c), which authorizes changes to the contract only by mutual agreement of the parties. *See* FAR 52.212-4(c) ("Changes in the terms and conditions of this contract may be made only by written agreement of the parties."). Specifically, CWT argues that the Solicitation requires the contractor to accommodate any change in the federal government's travel policy, enterprise architecture, security standards, mobile devices, and data security as well as any change an individual agency may make with respect to its travel management center, reporting requirements, agency business system, and

---

[4] In a post-award context, when a losing bidder believes the agency has misinterpreted a solicitation term in making an award, this court may be called upon to authoritatively resolve the meaning of that term. *E.g.*, *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 113 (2003) ("The court will construe the ambiguous [solicitation] provision against the drafter, as well as adopt the offeror's interpretation, only if the offeror's interpretation is reasonable.").

credit card vendor.  CWT contends that these nine provisions violate FAR 52.212-4(c) on the basis that they authorize the CO to unilaterally order the performance of additional and uncompensated work.

However, the Solicitation does not permit GSA to impose unilateral, uncompensated changes.  As noted in Part III.B, the pricing mechanism sets limits on the amount of work that GSA can require from the contractor.  The pricing provisions instruct offerors to include in their price proposals pricing assumptions that can effect limitations associated with meeting the Statement of Work's requirements.  If the pricing assumptions are accepted by GSA, they are incorporated in the final agreement.  *See* AR 678 (E.6.1(a)) ("The Offeror is advised that its offer, if accepted by the Government, will form a binding contract."); AR 4824 (If GSA decides it will accept an assumption, "the offeror would then be obligated to perform the contract in the manner as it was proposed . . . (i.e., with the assumptions/exceptions).") (CO's Supplemental Statement of Facts).  If GSA wishes to require work beyond the parameters set forth in the contract, then such changes would have to be negotiated pursuant to FAR 52.212-4(c), which is incorporated in the Solicitation in Section D.1.  AR 565.

In summary, in view of the pricing mechanism, the Solicitation does not authorize the imposition of unilateral, unlimited changes at no additional cost to GSA.  The contractor will be required to perform only the quantity of work consistent with the pricing assumptions to which GSA has agreed when it entered into the contract.  Any additional work beyond the agreed-upon limits will have to be negotiated and agreed upon in accordance with FAR 52.212-4(c).  Rather than violate FAR 52.212-4(c), the pricing mechanism is entirely consistent with that provision because it sets boundaries on the work that can be required of the contractor, and any additional work must be negotiated in accordance the FAR provision.[5]  Therefore, the premise of CWT's challenge is simply incorrect.  The Solicitation does not permit GSA to order unilateral, uncompensated changes in violation of FAR 52.212-4(c).[6]

_____

[5] If the Court were to accept CWT's contention that the Solicitation authorizes unilateral, uncompensated changes, it would render meaningless the changes clause incorporated into the Solicitation.  The Court should read the terms of the Solicitation in a manner that gives effect to each term.  *Gen. Dynamics Corp. v. United States*, 671 F.2d 474, 478 (Ct. Cl. 1982) ("Whenever possible, the terms of a contract must be read consistently with each other and so as to give them full effect.").  In doing so here, both the pricing mechanism and the changes clause are consistent with the Government's interpretation that the parties will be bound by the proposed pricing assumptions accepted by GSA and any work beyond that will have to be negotiated pursuant to FAR 52.212-4(c).

[6] CWT also contends that because these nine Solicitation terms are deviations from FAR 52.212-4(c), that GSA violated FAR 1.403, which permits deviations from the FAR only when the CO has justified the deviation and the agency head has approved it.  *See* Pl.'s Mot. at 11.  Because the Court finds that these nine provisions do not authorize unilateral, uncompensated changes in violation of FAR 52.212-4(c), the Court need not reach CWT's argument that the agency failed to obtain the requisite authority to deviate from FAR's requirements pursuant to FAR 1.403.

> D. *The Nine Challenged Provisions and the Transaction-Type Determination Standards Are Consistent with Customary Commercial Practice in Accordance with FAR 12.301(a)(2), But the 15-Year Fixed Price Provision Is Inconsistent with Customary Commercial Practice in Violation of FAR 12.302(a)(2).*

CWT contends that the nine challenged provisions, the transaction-type determination standards, and the 15-year fixed pricing schedule are inconsistent with customary commercial practice in violation of FAR 12.301(a)(2). The Government counters that GSA's market research demonstrated that each provision is consistent with customary commercial practice and therefore the provisions are consistent with FAR 12.301(a)(2).

"[C]ontracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses . . . [d]etermined to be consistent with customary commercial practice." [7] FAR 12.301(a)(2). The CO cannot tailor clauses or include additional terms that are inconsistent with customary commercial practice unless a waiver is obtained. FAR 12.302(c). In evaluating whether a solicitation's terms are consistent with customary commercial practice, the agency must engage in market research with the purpose of generating "a meaningful exchange of information between the agency and industry." *Smelkinson Sysco Food Servs.*, B-281631, 1999 WL 140173, at *4 (Comp. Gen. Mar. 15, 1999). [8]

> 1. <u>GSA's Market Research on the Nine Provisions Demonstrates That Such Provisions Are Consistent with Customary Commercial Practice and Therefore Do Not Violate FAR 12.301(a)(2).</u>

CWT contends that the nine challenged provisions violate: (1) FAR 12.301(a)(2) because they permit uncompensated, unilateral changes that are inconsistent with customary commercial practice; and (2) FAR 12.302(c) because GSA did not obtain the waiver needed to include terms in the Solicitation that are inconsistent with customary commercial practice. Pl.'s Mot. at 25.

First, CWT's argument that GSA's market research does not demonstrate that it is customary commercial practice to require a contractor to accommodate any unilaterally ordered change without compensation may well be accurate, but it is not relevant to this case. The reason is that the terms of the Solicitation do not in fact authorize GSA to unilaterally require

---

[7] The FAR defines a commercial item as any item customarily used by the general public. FAR 2.101 (definition of commercial item). The parties agree that the ETS2 system is properly considered a commercial item pursuant to FAR 2.101 and therefore subject to FAR Part 12. *See* FAR 12.000 ("This part prescribes policies and procedures unique to the acquisition of commercial items.").

[8] In *Smelkinson*, GAO stated that FAR Part 10 provides guidance to agencies with respect to the scope and proper methods for conducting market research, which may include contacting knowledgeable individuals in the industry, reviewing results of market research, publishing requests for information, and conducting interchange meetings with potential offerors. FAR 10.002(b)(2)(i), (ii), (iii), & (viii).

changes with no compensation.  As explained in Part III.B, the Solicitation's pricing mechanism effectively limits the amount of work that a contractor can be required to perform.  Therefore, CWT's contention that GSA's market research is inadequate is based on an erroneous premise.

Nevertheless, GSA's market research into each of the nine challenged provisions demonstrates that they are consistent with customary commercial practice.

*Federal Travel Policy and Agency Business Systems*.  With respect to the federal travel policy and agency business systems provisions, the Solicitation requires that the contractor accommodate changes in federal travel policy and an agency's business system without the need for reprogramming.  GSA's December 17, 2009 survey on configuration and customization reflected that many industry participants distinguish between configuration, which permits changes to be made in the application itself, and customization, which requires development of new programming code.  AR 4284-89.  Several of the firms in the industry noted that in commercial practice changes that can be accomplished through configuration were not priced separately, but changes that had to be done through customization were.  AR 4284 [***]; AR 4287 [***].  In addition, a report entitled "Corporate Travel Technology Today and Tomorrow" discussed the trend in the corporate travel industry to create service-oriented architectures that "add new services without the need to re-write the entire application."  AR 4251.  Therefore, the provisions relating to federal travel policy and agency business systems are entirely consistent with the agency's market research, which demonstrated that industry participants often provide configurable systems and implement such changes without separate compensation.

*Travel Management Centers*.  In conducting market research on the provisions that provide that the contractor must accommodate an agency's decision to utilize a new travel management center, GSA received quotes on the cost of this transition ranging from $5000 to $50,000, and found that the cost of the transition was not usually charged to the corporate customer.  AR 4290; *see also* AR 4684 (CO Statement of Facts) ("[T]here is typically no fee to the client to transition [travel management centers].").  The agency also evaluated the level of work required to complete the transition tasks needed to accommodate a new travel management center as listed in Attachment 15 to Section C of the Solicitation.  AR 4290-4303.  Thus, the market research does not indicate that the terms of the Solicitation are inconsistent with customary commercial practice.

*Federal Enterprise Architecture*.  The FEA provisions are also consistent with numerous industry standards used by commercial and government organizations, including IS 15704, the standards set by the International Organization for Standardization, and the Object Management Group's Object Management Architecture.  AR 4685-86 (CO Statement of Facts).  Again, CWT fails to establish that the terms that require a contractor to maintain compliance with FEA are inconsistent with customary commercial practice.

*Security Standards*.  With respect to the requirement that the contractor meet or exceed the security standards set by the federal government, GSA found that complying with security standards is customary commercial practice.  For example, [***].  AR 4307.

*Reports*.  The Solicitation's requirements that the contractor provide reports and produce customized reports are consistent with customary commercial practice as documented by market

research.  The "Corporate Travel Technology Today and Tomorrow" report found that "reporting applications provide a library of standard reports and the ability to create ad hoc reporting."  AR 4263.  Even CWT's standard travel agreement includes in the transaction/management fee provisions a "reporting package covering the [t]raveler's booking data," and it further allows the client to access and analyze its travel data.  AR 4633.  The reporting terms of CWT's standard travel agreement are consistent with other firms' terms.  AR 4689.  GSA's market research demonstrates that it is customary for firms providing travel services to furnish reports to customers and to include the costs in standard fees charged to the customer.  Therefore the provisions governing reports are consistent with customary commercial practice.

*Mobile Devices*.  The Solicitation provisions that encourage contractors to maintain compliance with emerging mobile platforms are also consistent with customary commercial practice.  GSA's market research demonstrated that the use of mobile devices for corporate travel is increasing, AR Tab 62, and that providing support for emerging technologies may be more appropriate as an objective than as a requirement, AR 4493 (Mobile Strategy for ETS2, Norm Rose) ("If capability is available today . . . from most vendors[,] the requirement was added as a mandatory requirement.  If capability is . . . still emerging in the market[,] the requirement was added as an objective." (capitalization altered)).[9]

*Data Security*.  Finally, GSA's market research found that the practice of aggregating and submitting data to the customer as required by the Solicitation is consistent with customary commercial practice.  AR 4264 (report on corporate travel stating that monitoring and controlling data aggregation as well as transferring this information to stakeholders in the organization were customary commercial practice).

GSA's market research demonstrates that each of the challenged terms are consistent with customary commercial practice.  Therefore, the nine challenged terms of the Solicitation are not arbitrary, capricious, or contrary to law.  In fact, they are consistent with customary commercial practice in accordance with FAR 12.301(a)(2).[10]

---

[9] CWT argues that Section C.3.3 of the Solicitation creates a mandatory requirement that contractors accommodate emerging mobile platforms.  AR 40.  However, Section C.3.3.2 lists the mobile platform requirement as an objective.  AR 43.  Therefore, the Court concludes that a fair reading of the provisions regarding the accommodation of mobile platforms shows that they describe objectives rather than mandatory requirements.  *See Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 792 (2008) (holding that the specific terms of a Solicitation control over the more general).

[10] Because the terms are consistent with customary commercial practice, the Court need not consider CWT's argument that GSA violated FAR 12.302(c) because it did not obtain the waiver required to use provisions that deviate from customary commercial practice.

2.      The Manner in Which the Solicitation Categorizes Transactions into Agent-Assisted Transactions and Online Transactions Is Consistent with Customary Commercial Practice.

CWT claims that the Solicitation's distinction between agent-assisted and online transactions is inconsistent with customary commercial practice in violation of FAR 12.301(a)(2).  Pl.'s Mot. at 31.  According to CWT, these categories are significant because contractors customarily charge four to five times more for transactions that require the assistance of an agent compared with those that are entirely conducted online.  *Id.* at 30.

The Solicitation defines an agent-assisted transaction as "one in which the services of a customer support agent are used explicitly for making and/or fulfilling travel arrangements," AR 6, and an online transaction as a "transaction . . . initiated and completed online . . . [with the possible] use of ETS2 customer support services for technical support or assistance in completing self service," AR 7-8.  Using its own contracts as a reference, CWT contends that the Solicitation improperly categorizes transactions in which a customer support agent provides technical support or assistance in completing a self-service transaction as an "online" rather than the more costly "agent-assisted" transaction.  Pl.'s Mot. at 30-31.

GSA's market research found that in the commercial market there are standard definitions for transactions conducted entirely by an agent or conducted entirely by self-service, but that there is no standard in the commercial market for differentiating transactions that are between those extremes (such as transactions that begin online, but require calling for technical assistance).  AR 4687-88 (CO Statement of Facts).  The Solicitation uses the standard definitions for online-only and agent-only transactions, and then categorizes the types of transactions that fall into each category.  AR 6-8.  The definitions of these transactions are consistent with customary commercial practice, and CWT has not shown that the method the Solicitation uses to categorize the types of transactions that fall into each category is inconsistent with customary commercial practice.  Therefore, the Solicitation's standards for determining transaction types are not contrary to FAR 12.301(a)(2).

3.      The 15-Year Fixed Pricing Schedule Is Inconsistent with Customary Commercial Practice, and the Waiver GSA Obtained to Extend the Length of the Contract Beyond Five Years Does Not Affect GSA's Obligation to Conform the Pricing Schedule to Customary Commercial Practice.

CWT also alleges that requiring offerors to submit a fixed pricing schedule that cannot be renegotiated over the 15-year contract term is contrary to customary commercial practice.  Pl.'s Mot. at 29-30.  The 15-year contract consists of a three-year base period and three four-year option periods, but the contractor must propose at the outset a fixed price for each option period. AR 12-26.  CWT argues that the requirement to set prices for the option periods at the beginning of a 15-year contract is inconsistent with customary commercial practice.  Pl.'s Mot. at 30.

The Government's market research does not demonstrate that the 15-year fixed pricing schedule is consistent with customary commercial practice.  Although GSA's market research demonstrated that a 15-year term is common in complex contracts, the research revealed nothing about whether setting the price for each option period at the outset of a 15-year contract is

consistent with customary commercial practice.[11] AR 4677 (CO Statement of Facts). The Court therefore concludes that GSA's market research does not show that the terms of the Solicitation that require offerors to propose fixed prices for the three-year base period and each of the three four-year option periods at the outset of the contract are consistent with commercial practice. The Court concludes that the 15-year fixed pricing schedule is inconsistent with customary commercial practice in violation of FAR 12.301(a)(2). It follows that the terms of the Solicitation requiring the 15-year fixed pricing schedule with prices set at the outset of the 15-year contract are contrary to law and therefore invalid.

The Government contends that GSA obtained a waiver to exceed the five-year limit on the duration of government contracts set by FAR 17.204(e) and that the waiver extends to the 15-year fixed pricing schedule.[12] Def.'s Mot. at 32 (citing AR Tab 48 (waiver)). However, the waiver to exceed the five-year limit set by FAR 17.204(e) only deals with the length of the contract and does not exempt GSA from the requirements of FAR 12.301(a)(2) that the Solicitation's terms be consistent with customary commercial practice.

Furthermore, the waiver to extend the contract beyond the five-year limit does not comply with FAR 12.302(c), which permits a waiver from customary commercial practice only when the agency can describe the customary commercial practice, show a need to include terms that are inconsistent with the customary practice, and provide a determination that customary terms are inconsistent with the Government's needs. GSA's waiver to exceed the five-year limit set by FAR 17.204(e) does not meet any of the waiver requirements of FAR 12.302(c). The waiver does not address customary commercial practice, nor does it show a need to include terms that are inconsistent with customary commercial practice. Therefore, GSA has failed to obtain a waiver to require offerors to propose fixed prices for each option period at the outset of the 15-year contract. The waiver of the five-year limit only addressed the duration of the contract and did not meet FAR 12.302(c)'s requirements for authorizing a deviation from customary commercial practice.

---

[11] In reaching its conclusion that a 15-year term was appropriate for a contract of this level of complexity, GSA examined commercial housing privatization, charge card services, financial management systems, and telecommunication contracts. AR 4677 (CO Statement of Facts). This research may speak generally to customary commercial practice with respect to the length of a complex contract, but it says nothing about whether a 15-year contract with prices for each future option period fixed at the outset is consistent with customary commercial practice in the travel service industry.

[12] "Unless otherwise approved in accordance with agency procedures, the total of the basic and option periods shall not exceed 5 years in the case of services [contracts] . . . ." FAR 17.204(e).

E.   *The Solicitation's Market Adjustment Clause Is Not Unlawful Because It Does Not Supersede Other FAR Provisions, Is Not Ambiguous, and Does Not Give the CO Unlimited Discretion.*

CWT challenges the Market Adjustment Clause on the grounds that:  (1) it illegally supersedes FAR provisions that provide the contractor the right to seek relief for changed conditions; (2) the term "market conditions" is inherently ambiguous; and (3) the clause gives the CO sole discretion whether to make an adjustment that CWT contends cannot be appealed pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 605 (re-codified as 41 U.S.C. § 7103 (2011)), and FAR Part 33.

CWT first argues the clause only compensates for "unforeseeable major changes in market conditions," AR 4679, and therefore illegally supersedes FAR 52.212-4(f), which describes the circumstances in which a contractor may seek relief for an excusable delay.  Pl.'s Mot. at 22, 24.  However, the Market Adjustment Clause does not by its terms supersede any FAR provision.  Rather, the clause must be read in conjunction with the FAR.  *See ICP Nw.,* 98 Fed. Cl. at 40-41 (interpreting a Solicitation term in a manner to make it consistent with the FAR).  The Market Adjustment Clause provides an additional layer of protection to the contractor above and beyond what is provided by FAR 52.212-4(c) and (f).  Therefore, the Market Adjustment Clause does not supersede any FAR provision.

Second, CWT argues that the term "market conditions" is inherently ambiguous because "GSA appears to be suggesting it will only pay the ETS2 contractor [for market changes] . . . but will not pay for all other changes, such as those ordered by the Government."  Pl.'s Mot. at 22-23.  However, CWT fails to explain how the term "market conditions" is open to more than one reasonable interpretation.  Furthermore, the Market Adjustment Clause itself describes what may be examined in order to determine whether market conditions have changed to such an extent that the contractor is entitled to seek compensation.  The Court therefore concludes that the term "market conditions" is not ambiguous.

Finally, CWT argues that the clause gives the CO sole discretion "to determine whether market conditions warrant an equitable adjustment," and therefore cannot be appealed pursuant to CDA and FAR Part 33.  Pl.'s Mot. at 23.  However, the CO does not have unlimited discretion because the clause itself requires the CO to consider certain sources in determining whether market conditions warrant a change in the terms of the contract.  AR 623 (authorizing adjustments to be made "subject to the Government's examination of industry-wide market conditions and documents requested by the contracting officer to support the reasonableness of the price adjustment").  In addition, the clause does not preclude review of the CO's decision, and, if it did, "the CDA trumps a contract provision . . . that purports to divest [a reviewing board or court] of jurisdiction."  *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 859 (Fed. Cir. 1997).  Therefore, if a CO were to make an unreasonable, arbitrary, or capricious decision with respect to whether the contractor was entitled to compensation due to unforeseeable market conditions, the contractor could challenge that decision.  *See George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 247 (2005) ("If unilateral discretion is granted to the government . . . decisions are reviewed for arbitrary or capricious abuse of that discretion.").  CWT has not demonstrated how the Market Adjustment Clause is inconsistent with CDA or

FAR Part 33. *See* FAR 52.212-4(d) ("This contract is subject to the Contract Disputes Act . . . .").

>   F.   *The Solicitation Terms Are Not Unduly Restrictive and Therefore Do Not Violate the Competition in Contracting Act.*

CWT's final argument is that the Solicitation is unduly restrictive of competition in violation of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253a(a)(1) (re-codified as 41 U.S.C. § 3306(a)(1) (2011)), because it authorizes GSA to unilaterally order uncompensated changes over the 15-year term of the contract and it subjects contractors to enormous risk by requiring them to submit firm fixed prices for the option periods at the outset of the contract. Pl.'s Mot. at 35. CWT argues that these provisions discourage competent bidders from participating, thereby reducing the competiveness of the Solicitation and violating CICA.

CICA requires that agencies create specifications that solicit proposals "in a manner designed to achieve full and open competition." 41 U.S.C. § 253a(a)(1)(A)-(C) (re-codified as 41 U.S.C. § 3306(a)(1)(A)-(C) (2011)). In creating terms to meet its needs, an agency "may include restrictive provisions only to the extent necessary to satisfy its needs." *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998) (citing 41 U.S.C. § 253a(a)(1)(A) (re-codified as 41 U.S.C. § 3306(a)(1)(A) (2011))); *see also* FAR 11.002(a)(1)(ii) (permitting agencies to use restrictive provisions when necessary to satisfy agency needs). A solicitation is not unduly restrictive if the agency shows that the terms at issue are "rationally derived" to meet the agency's objectives. *See CHE Consulting*, 74 Fed. Cl. at 748.

CWT fails to show that the Solicitation is unduly restrictive in violation of CICA. To the extent the terms of the Solicitation limit competition, they do so because GSA sought to correct deficiencies in ETS1. AR 4680 ("The requirements presented in ETS2 represent adoption of ETS1 'lessons learned'. . . . The ETS2 RFP makes incremental improvements over ETS1 by bringing clarity to the performance outcomes desired in usability and vendor performance.") (CO Statement of Facts). These requirements are reasonably related to GSA's efforts to improve the ETS1 system, and CWT does not explain how these requirements are not rationally related to achieving GSA's objectives.[13] Thus, the Court finds that the terms of the Solicitation are not unduly restrictive of competition and therefore do not violate CICA.

## IV.   Relief

Consistent with the foregoing, the Court hereby **ORDERS** the entry of a declaratory judgment and does hereby **DECLARE** that the 15-year fixed pricing schedule violates customary commercial practice and is therefore, in the absence of a valid waiver, arbitrary,

---

[13] CWT focuses largely on the fact that few bidders have submitted proposals in response to the ETS2 Solicitation, but this argument is unavailing because the total number of bidders does not determine whether a solicitation is unduly restrictive. *See Massa Prods. Corp.*, B-236892, 1990 WL 277508, at *4 (Comp. Gen. Jan. 9, 1990) ("[I]f a solicitation requirement [is] reasonably determined to be necessary, the fact that only one firm can comply with it does not indicate that a violation of the competitive procurement regulations has occurred.").

capricious, and contrary to law.  This Court's declaratory judgment that the terms of the Solicitation relating to the 15-year fixed pricing schedule are invalid requires GSA to modify the Solicitation to conform to this Court's ruling.  The Court intends that its declaratory judgment will afford CWT relief comparable to that of an injunction against GSA's utilization of the 15-year fixed pricing schedule in the Solicitation.[14]  *See CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 114 (2006) (declining to award injunctive relief when a declaratory judgment would have the same effect).  The Court further holds that the remaining provisions challenged by CWT are not arbitrary or capricious and are consistent with applicable law and regulations.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** CWT's motion for judgment on the administrative record and directs the entry of a declaratory judgment that GSA's inclusion in the Solicitation of the 15-year fixed pricing schedule violates customary commercial practice and is therefore, in the absence of a valid waiver, arbitrary, capricious, and contrary to law.  The Court **DENIES** CWT's motion with respect to its remaining claims.  The Court **GRANTS IN PART** the Government and Concur's cross-motions for judgment on the administrative record with respect to all claims other than the 15-year fixed pricing schedule, and the Court **DENIES** the Government and Concur's cross-motions with respect to the 15-year fixed pricing schedule.

Some information contained herein may be considered protected information subject to the protective order entered in this action on May 19, 2011 (docket entry 13).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **FURTHER ORDERS** that the parties shall file, by **Thursday, September 15, 2011**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge

---

[14] At oral argument the Government stated that entry of a declaratory judgment would be the appropriate relief should the Court sustain one or more of plaintiff's claims.  Aug. 11, 2011 Hr'g at 10:18 (Mr. Yates:  "What we would suggest is a declaratory judgment . . . .").